**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| FREDERICK SIMMONS, | : | |
| | : | |
| Petitioner, | : | Civil Action No. 10-0250 (RMB) |
| | : | |
| v. | : | **O P I N I O N** |
| | : | |
| MICHELLE R. RICCI et al., | : | |
| | : | |
| Respondents. | : | |

**Bumb**, District Judge:

Petitioner Frederick Simmons ("Petitioner") filed the instant petition ("Petition") seeking a writ of habeas corpus, pursuant to 28 U.S.C. § 2254(a); he is challenging his judgment of conviction rendered by the Superior Court of New Jersey.  See Docket Entry No. 1.   Petitioner duly paid his filing fee. See Docket Entry dated Jan. 22, 2010.  The Court informed Petitioner of his rights, pursuant to Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000), see Docket Entry No. 3; Petitioner did not respond to the Court's Mason notice, hence indicating that Petitioner wished for the Court to rule on his Petition as submitted.  The Court directed Respondents to file an answer to the Petition, and allowed Petitioner an opportunity to traverse.  See Docket Entry No. 4.  Upon the Court's finding that Respondents' initial answer failed to comply with the Court's order directing responsive pleading, see Docket Entries Nos. 7 and 8 (replicating Respondent's original answer and the Court's order detailing its shortcomings), and upon the Court's reorder of answer, see Docket Entry No. 8, Respondents complied.  See Docket Entries Nos. 11-20.

Petitioner did not traverse as to either Respondents' initial answer or their re-answer.  See generally, Docket.

For the reasons expressed below, the Court will dismiss the Petition and will decline to issue a certificate of appealability.  See 28 U.S.C. §§ 2253(c), 2254(a), (b), (c).

## I.      STANDARD OF REVIEW

Section 2254(a) of Title 28 of the United States Code gives the court jurisdiction to entertain a habeas petition challenging a state conviction or sentence only where the inmate's custody violates federal law:

> [A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County Probation Dept., 128 F.3d 152, 159 (3d Cir. 1997).  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."  Smith v. Phillips, 455 U.S. 209, 221 (1982).  "If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable.  It is unnecessary in such a situation to inquire whether the prisoner preserved his claim before the state courts."  Engle v. Isaac, 456 U.S. 107, 120 n.19 (1982). "[E]rrors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause."  Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997).  Moreover, "it is well established that a state court's misapplication of its own law does not generally raise a

constitutional claim." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) (citation omitted); see also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

A district court must give deference to determinations of state courts. See Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 534 U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996). Federal courts "must presume that the factual findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary." Stevens v. Delaware Correctional Center, 295 F.3d 361, 368 (3d Cir. 2002). Where a federal claim was "adjudicated on the merits" [1] in state court proceedings, § 2254 does not permit habeas relief unless adjudication of the claim

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "'contrary to' a Supreme Court holding if the state court 'contradicts the governing law [as it is interpreted or] set forth in [the Supreme Court's, rather than in any state court's or any circuit court's] cases' or if it 'confronts a set of facts that are materially

---

[1] "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001). A state court may render an adjudication or decision on the merits of a federal claim by rejecting the claim without any discussion whatsoever; such determination is nonetheless subject to same degree of deference for the purposes of the court sitting in habeas review. See Harrington v. Richter, 2011 U.S. LEXIS 912 (U.S. Jan. 19, 2011).

indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

In other words, under the "'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id.  at 413.  Whether a state court's application of federal law is "unreasonable" must be judged objectively, which means that an application may be incorrect, but still not unreasonable. Id. at 409-10.

A court begins the analysis by determining the relevant clearly established law.  See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004).  Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.   A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

## II.    BACKGROUND

### A.    Underlying Facts

The Superior Court of New Jersey, Appellate Division, detailed the underlying events as follows:

> The events that led to the indictment and convictions occurred at the Firehouse Tavern in Wildwood on May 10, 1996, at about 2:00 a. m.  Michael James, the part-owner and bartender, was getting ready to close when two black men, whom he did not know, walked into the bar at about 2:10 a.m. and one of them asked for a case of beer.  James had a "gut feeling" that he was about to be robbed, but dropped his guard when one of the men, [Petitioner], was recognized and greeted by Robert Connors, the only customer left in the bar.  However, the man nearest

to James, later identified as Poteat, pulled put a club from under his jacket and hit him in the head, knocking him to the ground.

James got up and started to fight for his life, he grabbed Poteat and punched him in the mouth while yelling for help. Poteat threatened to shoot James if he didn't keep the noise down.  During this time, James could not see what was going on between [Petitioner] and Connors.  James and Poteat continued grappling and rolled out through the door onto the sidewalk.  James kept yelling for help while continually being clubbed by Poteat.

[Petitioner] then came out the front door and kicked James in the throat. When a customer returned in has car to the tavern after having dropped off another patron, Poteat and [Petitioner] ran off in different directions.  The returning patron and James then drove . . . towards the police station . . . .

Once at the police station, James and the patron told the police of the robbery and informed their that [another] patron [i.e., Connors,] was still in the tavern.  An ambulance was called and patrol cars were dispatched to the tavern where police found Connors lying dead, face down on the bathroom floor in a puddle of blood and hot water from pipes where the sink had been broken off the wall.  Two of the three cash registers in the bar were open and emptied, only change remained.

Around 6:30 or 7:00 that morning, some two hours after the arrest of Poteat, Kevin McLaughlin, a Wildwood police detective, was directed to look for [Petitioner].  McLaughlin went to the Quality Restaurant where [Petitioner] was employed, but the owner said [Petitioner] was not there.  Other officers checked Commissioner's Court, [Petitioner] residence, to no avail.  McLaughlin returned to the Quality Restaurant and was again told [Petitioner] was not [there], but would be in later to work the lunch shift.  McLaughlin went back a third time between 10:30 a.m. and 11.00 a.m , and was once again told [Petitioner] was still not there, however, as he was about to leave the door opened and [Petitioner] said, "are you guys looking for me?"  McLaughlin told him that they wanted to talk to him at police headquarters.  [Petitioner] replied, "let's go" and did not ask why. Nor did [Petitioner] complain of physical injuries, or show any sign of being under the influence of drugs or alcohol.

At police headquarters, after McLaughlin administered Miranda warnings to [Petitioner,] who acknowledged his rights and waived them, [Petitioner initially] told McLaughlin that he was at the Firehouse Tavern, but had no involvement in any crime.  He then changed his story and made an inculpatory statement which was held admissible after a hearing.  A tape and transcript of [Petitioner's] confession were presented to the jury.  In it, [Petitioner] said that about 1:20 a.m. Poteat approached him as he was standing by the Sportsmen's

Bar on New Jersey Avenue and Garfield Avenue.  Poteat wanted him to take a walk to see if they could make some money, which [Petitioner] understood to mean swindle someone or make a drug buy.  As they walked to the Firehouse Tavern, Poteat told him there should be some "good money" there because it was a busy place.  [Petitioner] did not know if they were going to ["]get money["] from someone there or from the bar itself.

They looked inside the bar from the Park Boulevard side and saw two heads.  They walked in and [Petitioner] recognized the patron and greeted him. [Petitioner] asked the patron for a cigarette and he gave him one.  [Petitioner] then heard scuffling between James and Poteat and because the patron wanted to help James, but [Petitioner] said he did not want to get involved, he pulled the patron into the bathroom.  The event was described by [Petitioner] as "like a security thing at first . . . and then it became like a . . . shut the hell up."  He threw the patron face down into the sink because he was afraid of being identified.  The patron started yelling about helping James.

Then the patron made eye contact with [Petitioner] "which [– according Petitioner –] was a no-no to [him]," so [Petitioner], who was six feet tall and weighed 290 pounds, slammed the patron to the ground and kicked him on the back of the neck.  [Petitioner] claimed he did not "really want to hurt him1 but rather just to "shut him up."  He straddled the victim, holding him down, and took a straight knife with a six-inch serrated edge from is back belt and "took it straight to him."  "I went to the neck" [Petitioner stated,] and "just did the job." [Petitioner]  kicked him in the head, wiped the knife with a paper towel, exited the bathroom and tried to leave, but ran into James and Poteat outside the door. [Petitioner]  kicked James to get him out of the way, but because of the noise of the fighting he went back into the tavern and [exited] through the Pine Avenue door, [then] ran an "obstacle course," and eventually threw away the knife. Subsequent to the statement, McLaughlin arrested [Petitioner].
. . .

James suffered a fractured left hand, a fractured skull, cuts on his head which required eighty-two staples, and numerous bruises.  Four to five days later, he identified Poteat and [Petitioner] as the two who came into the bar.  According to James, about $700 was missing from the cash registers . . .

Thomas Austin worked with [Petitioner] at the Quality Restaurant in 1996 . . . testified that Poteat, whom Austin knew, told him that Poteat and a friend (Austin presumed the friend was [Petitioner] who was standing across the street), were going to rob the Firehouse Tavern and another bar and asked Austin to be the getaway driver, but Austin declined the proposal.  Austin also said that [Petitioner] and Poteat appeared to be high on cocaine at the time.

Docket Entry No. 14-12, at 6-11.

B.    **Trial**

The Appellate Division panel presiding over Petitioner's direct appeal, described the trial events as follows:

> There was testimony by the State medical examiner of multiple wounds on the deceased victim, including several penetrating or stab wounds in the neck, as well as scald wounds about the face and arms.  The neck wounds severed both jugular veins and a carotid artery.  A knife found in a park two blocks from the tavern with a "scalloped appearance" was identified as consistent with the edge of the knife that inflicted the wounds.

> [Petitioner] did not testify on his own behalf.  Instead, he presented witnesses to support his argument that he had a mental disease or defect which, combined with cocaine ingestion, made him unable to form the intent to knowingly commit the murder.

> Harold Lanzoni, a certified scientist, tested urine taken from [Petitioner] at 8:40 p.m. on May 10, 1996 [that is, about twenty hours after Petitioner and Poteat entered the tavern].  The analysis revealed that [Petitioner's] urine was positive for cocaine metabolite, a byproduct of cocaine.  George Jackson, a forensic toxicologist called by the defense, tested [Petitioner's] hair on August 15, 1996, and found ethylegonidine and cocaethylene, metabolites of cocaine and also morphan, an opiate, which indicated chronic, repetitive drug use.

> Amelia Preister, [Petitioner's] step-daughter, testified that [Petitioner] had married her mother, Mina, in April 1992 or 1993, and had lived with her for ten years before that.  [Petitioner] was "like a real father" to Mina's six children.  Mina died of a brain aneurism in September 1995, and this assertedly devastated [Petitioner].  The children were placed with various relatives, despite [Petitioner's] wanting to care for them, and he was evicted from his home.  After Mina's death, [Ameria] said [Petitioner] increased his drinking, did not eat, and stopped taking care of his physical appearance.  Kimberly Fashaw, Mina s best friend, echoed Preister's testimony, adding that after Mina's death, [Petitioner] "looked all crazy" and was often high and agitated.

> Sereather Pine, [Petitioner's] sister, recalled that as children, one of his five brothers and sisters was given to one of her mother's friends because their mother could not care for them, and eventually, [Petitioner] was forced to live with relatives.  One time, [Petitioner] was caught in a cross-fire and was shot with fifteen pellets.  She stated that after Mina died, [Petitioner] became unhygienic and frequently used drugs and alcohol.

David Bogacki, an expert in forensic psychology, performed a total of eight tests on three dates in 1996 to determine whether [Petitioner] had a mental disease or defect.  Bogacki determined that [Petitioner], then age 35, had no organic brain damage, but was in the "borderline" range of intelligence, with an IQ of 75-81, and a mental age of thirteen.  [Petitioner] showed signs of a thought disorder, bipolar disorder (formerly known as manic-depression), inappropriate affect (inappropriate emotional responses), autistic thought process ("I think it so it's true"), low frustration level, and poor impulse control.  His negative personality characteristics were accentuated by his drug use.  Bogacki concluded that [Petitioner] suffered from a mental disease or defect, including depression, anxiety, bipolar disorder and mixed personality disorder, with paranoid traits, borderline traits, and dependent traits.

Kenneth Weiss, a forensic psychiatrist, met with [Petitioner] four times and reviewed Bogacki's findings.  [Petitioner] told him a story similar to what he told the police, emphasizing that he wanted to stay out of danger and that the killing was unintended.  Weiss noted [Petitioner's] multiple losses, his cocaine addiction and his ingestion of alcohol that night.  He determined that while in the Firehouse Tavern, [Petitioner]  was "craving" drugs, and in a "dream-like" state.  He said that due to his mental disease or defect, [Petitioner] did not have the ability to form the mental capacity to act knowingly and purposefully.

Leon Rosenberg, a psychiatrist, also interviewed [Petitioner] and reviewed his history.  He concluded that his cocaine use contributed to [Petitioner] paranoia about the victim identifying him, and that due to the cocaine, [Petitioner] was unable to purposefully and knowingly commit murder.  Rosenberg recognized that his view was contrary to Weiss's view that there was insufficient evidence to establish voluntary intoxication.

Id. at 11-14.

During Petitioner's post-conviction relief ("PCR") proceedings, the Appellate Division

supplemented the foregoing discussion with the following observations:

In support of this defense, [Petitioner] first presented the testimony of Dr. Kenneth J. Weiss, a forensic psychiatrist, who stated that [Petitioner] had told him that, in the hours immediately prior to the incident, [Petitioner] had consumed cocaine and two to three forty-ounce bottles of malt liquor.  In his report, however, Dr. Weiss had opined that "the evidence was not conclusive that [Petitioner] was intoxicated or that he would meet the prostration of faculties test in which voluntary intoxication itself negates elements of culpability."  The prosecutor confronted Dr. Weiss with this portion of his report on cross-examination.

Defendant then presented Dr. Leon Rosenberg, a forensic psychiatrist, who testified that [Petitioner] had told him that he had used twenty to twenty-four bags of cocaine and had consumed eighty ounces of malt liquor and two beers on the evening in question.  Dr. Rosenberg concluded that "because of the cocaine in his system," [Petitioner's] faculties were prostrated and he was not capable of performing a knowing or purposeful act on the occasion in question.  On cross-examination, Dr. Rosenberg acknowledged that his conclusion contradicted that of Dr. Weiss. The prosecutor commented extensively in summation on the discrepancy between the two defense experts' opinions.

Docket Entry No. 11-23, at 5-6.

### C.      Conviction and Sentencing

After a jury trial, [Petitioner] was found guilty . . . of murder . . . , felony murder . . . , conspiracy to commit armed robbery . . . , two counts of armed robbery . . . , attempted murder (N.3S.A. 2C:ll-3 and 2C:5—l); aggravated assault . . . , possession of a weapon for an unlawful purpose . . . , unlawful possession of a weapon . . . and hindering apprehension . . . .  Various pretrial motions were denied.  . . .  Poteat was indicted as a codefendant, but tried separately before a different jury and was also found guilty of all counts on the same indictment, [Poteat's conviction was affirmed on appeal].

The jury considered capital punishment, but was unable to reach a unanimous decision.  The trial judge vacated the conviction on one robbery charge, merged the felony murder conviction into the murder conviction and sentenced [Petitioner] to life in prison, thirty years without parole eligibility.  The judge also merged the conspiracy to commit armed robbery and armed robbery convictions into the remaining armed robbery conviction and imposed a fifteen year prison term, to run consecutively to the sentence on the murder conviction. The judge merged the conviction for aggravated assault into the attempted murder conviction and imposed a twenty year sentence, consecutive to the murder term, with eight years of parole ineligibility.  The aggravated assault conviction was merged into the attempted murder conviction and the possession of a weapon for an unlawful purpose and the unlawful possession of a weapon convictions were merged into the attempted murder, murder and robbery convictions.  In addition, on the hindering apprehension conviction, a consecutive four year term was imposed.  Thus, [Petitioner's] aggregate sentence was a life term, plus thirty-nine years, with thirty-eight years of parole ineligibility.

Docket Entry No. 14-12, at 2-4.

## III.    PETITIONER'S INSTANT CHALLENGES

In his Petition, Petitioner raised the following seventeen Grounds (which, with sub-grounds factored in, amount to the total of twenty grounds):

GROUND ONE:    The trial court erred in ruling that petitioner voluntarily waived his <u>Miranda</u> rights in violation of the Fifth Amendment of the U.S. Constitution which compelled petitioner to be a witness against himself in a criminal case which violated petitioner's right to defend life and liberty with due process of law as secured by the Fifth and Fourteenth Amendment of the U.S. Constitution and his right to a fair trial by an impartial jury as secured by the Sixth Amendment of the U.S. Constitution.

GROUND TWO:    The trial court erred by admitting into evidence the tape recorded confession of petitioner as that recording failed to meet the standards for its admission which deprived petitioner of his right to defend life and liberty with due process of law as secured by the 5th and 14th Amendments of the U.S. Constitution and a trial by an impartial jury, U.S Const[itution] 6th [A]mendment.

GROUND THREE:    The trial court erred by denying the motion for a judgment of acquittal in violation of the due process clause of the 5th and 14th Amendments of the U.S. Constitution.

GROUND FOUR:    The trial court erred by admitting the autopsy photos as they were unduly prejudicial and not probative in value thereby violating petitioner's right to a fair trial by an impartial jury contrary to the 6th Amendment of the U.S. Constitution and also violated petitioner's right to defend life and liberty with due process of law as secured by the 5th and 14th Amendments of the U.S. Constitution.

GROUND FIVE:    The charge to the jury in its entirety, including the manner in which the court responded to jury requests for clarification, was confusing, misleading and prejudiced the petitioner's right to a fair trial by an impartial jury violating the 6th Amendment of the U.S. Constitution as well as depriving petitioner of his right to defend life and liberty with due process of law as secured by the 5th and 14th Amendments of the U.S. Const[itution].

GROUND SIX:            The verdict is against the weight of the evidence and the
                      petitioner is entitled to a new trial; and this deprived
                      petitioner his right to defend life and liberty with due
                      process of law secured by the 5th and 14th Amendments of
                      the U.S. Const[itution].

GROUND SEVEN:         The conduct of the prosecutor, which exceeded the bounds
                      of proper advocacy, denied petitioner a fair trial by an
                      impartial jury in violation of the 6th Amendment of the
                      U.S. Constitution and deprived petitioner of his right to
                      defend life and liberty with due process of law as secured
                      by the 5th and 14th Amendments of the U.S. Constitution.

GROUND EIGHT:         The errors committed, in their entirety, dented the
                      petitioner a fair trial by an impartial jury in violation of the
                      6th Amendment of the U.S. Constitution and constituted
                      cumulative error contrary to the due process clause of the
                      5th and l4th Amendments of the U.S. Constitution.

GROUND NINE:          The petitioner's unconstitutional illegal arrest without a
                      warrant violated the 4th amendment of the U.S.
                      Constitution and based upon this the trial court committed
                      plain error in admitting the tainted confession because the
                      confession should have been suppressed because the casual
                      chain between the illegal arrest and the interrogation was
                      unbroken, consequently when the court allowed the
                      confession for consideration by the petit jury, this clear
                      error deprived petitioner of a fair trial by an impartial jury
                      violative of the 6th amendment of the U.S. Constitution
                      through tainted illegal arrest, and the fourth amendment
                      illegal seizure of the petitioner is applicable to state
                      officials through the due process clause of the 14th
                      amendment of the U.S. Constitution which deprived
                      petitioner of his right to defend life and liberty with due
                      process of law and is therefore cognizable where judgment
                      of conviction should be vacated and remanded for a new
                      trial.

GROUND TEN:           The exclusion of Detective McLaughlin's illegal
                      warrantless arrest section of the testimony of the pretrial
                      evidentiary hearings for review by the petit jury concerning
                      the circumstances of petitioner's confession and taped
                      statement resolved against petitioner at the pretrial hearing
                      should have been included in exhibits for the petit jury as

the testimony presented to the petit jury during trial was not complete, depriving petitioner of his fundamental right to defend life and liberty with due process of law under the 14th amendment of the U.S. Constitution, because the issues concerning credibility are for the jury to decide and exclusion of the transcripts undercut the petitioner's right to compulsory process, confrontation clauses, and the right to a fair trial by an impartial jury as secured by the 6th amendment of the U.S. Constitution constituting plain error requiring vacation of the judgment of conviction as this claim is cognizable upon which relief should be granted on this petition.

GROUND ELEVEN:   The language of the indictment in Count One failed to establish that twelve jurors concurred in finding the petitioner indictable as a true bill for violation of either subsection (a)(l) or subsection (a)(2) of the murder statute in separate counts, . . . , contrary to Article I, paragraph 10 of the New Jersey Constitution based on the "Disjunctive Indictment" rendering Count One impermissibly and unconstitutionally vague depriving petitioner of his right to equal protection of the laws as secured by the 14th amendment of the US Constitution; further, the trial court lacked jurisdiction to submit Count One to a petit jury pursuant to R. 3:22-2[(]b) as the grand jury did not concur in Count One of the indictment pursuant to R. 3:7-3(b) to include the scienter of each subsection of the statute separately as required by statute and NJ court rules for purposeful, murder, knowing murder as separate counts violating petitioner's rights as secured by R. 3:22-2(a)(b)(d) when trial proceedings went forth to a petit jury of this disjunctive indictment using purposeful "or" knowing murder on Count One disjunctively, wherefore post-conviction relief must be granted due to lack of fundamental fairness in following the state constitution of N.J., the murder statute and court rules specifying grand jury proceedings and relief should be granted vacating the judgment of conviction and order for commitment and dismissing the indictment with prejudice as a new trial would violate the double jeopardy clause of the 5th Amendment of the U.S. Constitution, cum[u]latively depriving petitioner of tie process of law, U.S. Constitution 5th and 14th Amendments.

12

GROUND TWEL[]VE:        The trial court vitiated the verdict of the jury by stating that the jury did not have to agree unanimously as to which form of murder is present if all jurors agree unanimously that one form of murder or the other was committed constituting structural error infecting the jury's deliberations depriving petitioner of his right to defend life and liberty with due process of law, U.S. Constitution 5th and 14th Amendments, depriving him of his right to a fair trial by an impartial jury, U.S. Constitution 6th Amendment and the conviction must be vacated and remanded for a new trial.

GROUND THIRTEEN:        The petitioner was deprived of effective assistance of counsel on direct appeal in violation of the 6th Amendment of the U.S. Constitution when appellate counsel failed to litigate the illegal arrest without a warrant contrary to the 4th amendment of the U.S. Constitution issue; exclusion of testimony of pretrial hearings from the trial; the disjunctive indictment issue of Count One; and the trial court's vitiated verdict of the jury and the adjudication on direct appeal was therefore unconstitutional.

GROUND FOURTEEN:        Counsel was ineffective in violation of federal constitutional requirements.  Counsel compromised the defense by providing the prosecutor with diametrically opposed expert opinions as to the defense of intoxication; and by calling upon Dr. Weiss to testify.  As a result of counsel violating the discovery rule; the rules of professional conduct for defense counsel to zealously represent their client within the bounds of law and ethics; counsel was constitutionally ineffective, depriving the petitioner of a defense; and such conduct compromised the integrity of the trial.

GROUND FIFTEEN:        Appellate counsel was ineffective in violation of federal constitutional requirements.

GROUND SIXTEEN:        Trial counsel was ineffective in violation of federal constitutional requirements and for not lodging appropriate objection to the charge; and appellate counsel for not challenging the appropriate section of the charge.

GROUND SEVENTEEN:        Petitioner's convictions must be reversed due to ineffective assistance of counsel in violation of federal constitutional

13

requirements this matter must be remanded because a prima facie case of ineffectiveness of counsel was established.

A.    Trial counsel was Constitutionally deficient by having Dr. Weiss testify, who eviscerated the intoxication/diminished capacity defense.

B.    Trial counsel was constitutionally deficient by not requesting the <u>Cooper</u> charge in the jury instructions and appellate counsel was constitutionally deficient by not raising this issue on direct appeal.

C.    The cumulative errors mandate that petitioner's convictions be reversed and that he be afforded an evidentiary hearing.

Docket Entry No. 1, at 10-14 (punctuation, capitalization and lack thereof in original).

## IV.    DISCUSSION

### A.    Ground One

Pursuant to the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment, a confession must be voluntary to be admitted into evidence.  <u>See</u> <u>Dickerson v. United States</u>, 530 U.S. 428, 433 (2000).  <u>Miranda</u> provides that the accused may waive his rights, but must do so "voluntarily, knowingly and intelligently."  <u>Miranda</u>, 384 U.S. at 475.

To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized.  Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required.  He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.  Opportunity to exercise these rights must be afforded to him throughout

14

the interrogation.  After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

Id. at 478-79.

The Miranda warnings are a constitutional requirement.  See Dickerson, 530 U.S. at 444.  "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry.  But . . . '[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was "compelled" despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.'" Id. at 444.

The Supreme Court has made clear that a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion."[2] Arizona v. Fulminante, 499 U.S. 279, 288 (1991).  In determining whether a statement is voluntary, Supreme Court precedent requires consideration of "the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." Dickerson, 530 U.S. at 434 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).  These surrounding circumstances include "not only the crucial element of police coercion," Colorado v. Connelly, 479 U.S. 157, 167 (1986), but may also include such aspects as the length of the interrogation, its location, its continuity, the defendant's maturity and akin.  See Withrow

_____

[2] But the Supreme Court noted that "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence [because t]he fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated." Miranda, 384 U.S. at 478.

v. Williams, 507 U.S. 680, 693 (1993) (internal citations omitted); see also Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002).

In determining whether there has been a valid waiver of Miranda rights, a court must conduct a two-part inquiry under a totality of the circumstances standard.  See Moran v. Burbine, 475 U.S. 412, 421 (1986).  First, the court shall looks into the voluntariness of the statement, and whether the waiver was freely and deliberately given as opposed to being obtained by coercion, intimidation, or deception.[3]  See id.  Second, the court must consider whether the waiver was "knowingly and intelligently" made, that is, whether the accused was fully aware "both of the nature of the right being abandoned and the consequences of the decision to abandon it."[4]  Id.

"[S]ubsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the Miranda warnings, often require the resolution of conflicting testimony of police and defendant.  The law is

---

[3]  "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986); see also Arizona v. Fulminante, 499 U.S. 279, 288 (1991)(a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion"); Lam, 304 F.3d at 264.  Absent police overreaching, which is causally related to the confession, "there is simply no basis for concluding that a state actor has deprived a criminal defendant of due process of law."  Connelly, 479 U.S. at 164.

[4]  The "totality of the circumstances" approach is the clearly established federal standard applied to determine whether there has been a voluntary waiver of Miranda rights.  See, e.g., Fare v. Michael C., 442 U.S. 707, 725 (1979); United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994).  It looks to the person's familiarity with the criminal justice system, the timing of the Miranda warnings and the statement given, and the length and nature of the interrogation and the accompanying detention.  See United States v. Velasquez, 885 F.2d 1076, 1086 (3d Cir. 1989), cert. denied, 494 U.S. 1017 (1990); United States v. Vasquez, 889 F. Supp. 171, 177 (M.D. Pa. 1995).  New Jersey state courts have traditionally employed the totality of the circumstances test. See State v. Presha, 163 N.J. 304 (2000); State v. Miller, 76 N.J. 392, 402 (1978).

therefore clear that *state-court findings on such matters are conclusive on the habeas court if fairly supported in the record*[5] and if the other circumstances enumerated in § 2254(d) are inapplicable."  Miller v. Fenton, 474 U.S. 104, 117 (1985) (emphasis supplied).

In Petitioner's case,

[the trial court held] a pretrial Miranda hearing to determine the admissibility of [Petitioner's confession] statement.  Detective McLaughlin testified substantially the same as he had at trial.  As a result of police contact with Poteat, he and Lieutenant Todd Pierce of the Cape May County Prosecutors Office set out to locate [Petitioner].  On their third attempt to locate him at the Quality Restaurant, [Petitioner] showed up as earlier described.  [Petitioner] was asked to accompany the officers to headquarters and he was not handcuffed.

According to McLaughlin, although [Petitioner] did not appear to be under the influence of alcohol or drugs, he was not specifically asked. . . . Miranda warnings were read to [Petitioner,] who also signed a waiver of those rights, but McLaughlin soon realized that he had mistakenly read the back side of the card, which contained a waiver for a search.  He then flipped the card over and read [Petitioner] the correct [Miranda] rights.  [Petitioner] then signed the card and chose to speak to McLaughlin without an attorney.

Simmons was described as "extremely calm" at the interview and "very thoughtful prior to giving an answer."  At no time did he demonstrated an inability to understand what he was being asked or to respond.  After his statement, McLaughlin asked [Petitioner] to give the statement on tape.  Although [Petitioner] was not provided with a meal during the interview process, he was given soda and cigarettes.  Detective Pierce also testified at the hearing, corroborating McLaughlin's testimony.

Harold Lanzoni, the forensic toxicologist who determined that urine tests taken from [Petitioner] on May 10 showed cocaine metabolites, also testified at the hearing.  He said cocaine had been ingested sometime within the previous three days, but he could not further pinpoint the time of intake.  The judge found that:

the State has clearly met its burden of establishing, in my opinion, beyond any reasonable doubt that the defendant was appropriately given his rights and appropriately waived them once having understood what his rights

---

[5]  The government "need prove waiver only by a preponderance of the evidence." Connelly, 479 U.S. at 168.

were and agreed to discuss the matter with the authorities without an attorney present.

The judge acknowledged McLaughlin's initial error with regard to the proper reading of the card, but found that given that McLaughlin had had a "sleepless night" it was not a surprising mistake and was not "fatal." Concerning Lanzoni's testimony, the judge noted that there was "no way of knowing the quantity of the drug ingested or the effect that it would have had on the defendant." The judge acknowledged that [Petitioner] claimed to have drunk alcohol, but found that "we don't really know the precise details of his consumption of alcohol or what the effect would have been upon him." The judge further explained:

> Even if the defendant the night this event occurred was under the influence of drugs or alcohol, the following morning when he was picked up from his place of employment — and it's worthy of note that he was at work at the time he was picked up so at least he thought that he was in a clear enough state of mind that he could resume his day-to-day normal activities and fulfill his job responsibilities in the ordinary course of affairs. Just the fact he had consumed substances the night before, assuming that's all true, is not, in and of itself, a sufficient basis for voiding his waiver of his Miranda rights and somehow concluding that his statement was involuntarily made.

> The judge also commented that [Petitioner] was able to respond directly to questions posed and was able to give such detailed descriptions of the event that, in my opinion, his statement alone conclusively establishes that the defendant, when the statement was given, had the mental capability to both understand the Miranda [warnings] as well as waive his Miranda rights. There was nothing about the circumstances of the interview that was coercive.

Docket Entry No. 14-12, at 14-16.

The findings of Petitioner's trial judge are conclusive for the purposes of this Court's review, since the above-quoted findings are more than "fairly supported in the record": these findings are supported with the degree of abundance providing this Court with no basis whatsoever to second-guess the trial judge's conclusions. See Miller, 474 U.S. at 117. Moreover, nothing in the record suggests that police officers used unnecessary or overbearing psychological tactics to extract inculpatory statements from Petitioner. Consequently, after

18

careful review of the record, this Court cannot conclude that the determination of the trial court in admitting Petitioner's confession resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See Williams, 529 U.S. at 405-06.  The state courts applied the correct law and facts in reaching its determination that there was no Miranda violation, and that the statement was voluntarily, knowingly and intelligently given.  Petitioner has failed to demonstrate that the state court opinion, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified.  See Matteo, 171 F.3d at 891. Therefore, the Court will deny federal habeas relief on this claim.

### B.    Ground Two

In his Ground Two, Petitioner contends that admission of the electronic recording of his confession violated Due Process guaranteed by the Fourteenth Amendment of the Constitution because: (a) small parts of the recording were inaudible (since Petitioner spoke in a rather soft voice regardless of being asked to speak up); and (b) Petitioner is of opinion that the electronic recording containing these small inaudible portions should have been excluded from evidence as not meeting the evidentiary standard set forth by the state courts in State v. Driver, 38 N.J. 255 (1962).[6]

---

[6] Petitioner's defense counsel moved Petitioner's trial court for exclusion relying on Driver; their motion was denied by Petitioner's trial judge who ruled as follows:

> I'm satisfied[,] pursuant to State v. Driver[,] that the State has met its proof and that the minor inaudibilities in the tape are explained by the fact that [Petitioner] spoke in a fairly softer voice and was, in fact, initially asked to speak up and

(continued...)

This Court agrees with Respondents that Petitioner's Ground Two, while mentioning the Due Process Clause, essentially raises an issue falling within the province of the New Jersey Rules of Evidence.  Petitioner in effect contends that admission of the tape violates due process because it was not in accordance with the state rules of evidence.  However, as this Court already explained and as Respondents correctly noted, "errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause."  Johnson v. Rosemeyer, 117 F.3d at 110.  Moreover, "a state court's misapplication of its own law does not generally raise a constitutional claim."  Smith, 120 F.3d at 414; see also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).  To the extent Petitioner's Ground Two could be construed as raising a due process claim, the claim fails, as "the Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."[7]  Marshall v.

---

[6](...continued)
didn't consistently do so; at times seemed to mumble.  That those moments of inaudibility are so insignificant in light of the length and detail in the statement as a whole as not to warrant exclusion.  . . .  The State has met its burden pursuant to State v. Driver.

Docket Entry No. 12-6, at 1.

[7] Moreover, Petitioner's trial judge stressed, during the jury instruction stage, the jurors' obligation to determine the credibility of Petitioner's confession, stating:

Now there was in this case for your consideration an oral statement allegedly made by the defendant.  It is your function to determine whether or not the statement was actually made by him, and if made, whether the statement or any portion of it is credible. In considering whether or not an oral statement was actually made by him, and if made, whether it is credible you should receive, weigh and consider this evidence with caution based on the generally recognized risk of misunderstanding by the hearer.

Docket Entry No. 19-3, at 13.

20

Lonberger, 459 U.S. 422, 438 n.6 (1983).  Hence, Petitioner's Ground Two will be dismissed as
not warranting habeas relief.

C.      **Grounds Three and Six**

In his Ground Three, Petitioner asserts that his trial court erred denying him judgment of
acquittal, while – in his Ground Six – Petitioner asserts that the guilty verdict entered against
him was against the weight of evidence and his trial court should have ordered a new trial.

A claim that the verdict is against the weight of the evidence is essentially a matter of
state law, and does not raise a federal constitutional question unless the record is completely
devoid of evidentiary support in violation of the Petitioner's due process rights.  See
Cunningham v. Maroney, 397 F.2d 724, 725 (3d Cir. 1968), cert. denied, 393 U.S. 1045 (1969).
Thus, a claim that the jury's verdict was against the weight of the evidence raises a due process
concern only where, "after viewing the evidence in the light most favorable to the prosecution,
[no] rational trier of fact could have found the essential elements of the crime beyond a
reasonable doubt" should the writ issue.  Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also
Singer v. Court of Common Pleas, Bucks County, 879 F.2d 1203, 1206 (3d Cir. 1989).  Factual
issues determined by a state court (jurors included) are presumed to be correct, and the petitioner
bears the burden of rebutting this presumption by clear and convincing evidence.  See Werts v.
Vaughn, 228 F.3d 178, 196 (3d Cir. 2000) (citing 28 U.S.C. § 2254(e)(1)).

Here, evidence against Petitioner were overwhelming: Austin testified as to Poteat's
request to drive Poteat and Petitioner to the place where Poteat and Petitioner intended to
commit and did, in fact, commit the charged crimes; James (the bartender and the surviving
victim of the robbery) testified – in great detailed – about the crime (he also identified Petitioner

as one of the assailants and, in addition, selected Petitioner's photograph from a photo array);

Davis (a witness of the crime) recognized Petitioner and testified about the details of the offense;

police officers provided testimony implicating Petitioner in the crime; and Petitioner's own

statements verified the Petitioner did, indeed, commit the offenses he was charged with.  Simply

put, the record is heavily laden with evidence of Petitioner's guilt.  Conversely, Petitioner fails to

offer the Court any evidence -- and, certainly, he offers no clear and convincing evidence -- that

any reasonable trier of fact would be unable to find Petitioner guilty on the basis of the record

presently before this Court.[8]  Therefore, Petitioner's claims asserting wrongful denial of a verdict

of acquittal or Petitioner's entitlement to a conclusion that the jurors entered the verdict against

the weight of evidence are wholly without merit and, as such, these claims warrant no habeas

relief.

### D.      Ground Four

In his Ground Four, Petitioner argues that his trial court unduly admitted into evidence

the photograph of the body of Connors, the non-surviving victim of the crime who suffered – and

died from – the severe injuries inflicted upon him by Petitioner.

---

[8]  In the event Petitioner's Ground Three and Gound Six are construed as statements that Petitioner, indeed, committed the crimes he was charged with but imply a claim that Petitioner should have been found "not guilty" on the grounds of lack of mental capacity, Petitioner's challenges analogously fall, since: (a) the state court and the jurors determined that Petitioner's defense asserting lack of mental capacity was without merit; and (b) all Petitioner asserts is his reliance on factually and logically deficient Rosernberg's report and substantively irrelevant aspects of other findings.  See Docket Entry No. 11, at 23-47 (cataloguing the string of deficiencies plaguing Rosernberg's report, Rosernberg's insufficient credentials and factual irrelevance of many aspects of other findings, which were marred by both lack of relevant time frame and lack of credible (or any) verification of Petitioner's veracity as to the information he was providing at the time when he already knew he was facing a conviction for murder).  However, Petitioner's highly unreliable allegations cannot amount to clear and convincing evidence this Court can credit as evidence rebutting the factual findings made by the state courts.

Petitioner's Ground Four does not merit habeas relief.[9]

As noted supra, "the Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall, 459 U.S. at 438 n.6. Thus, the admissibility of evidence is generally a question of state law which is not cognizable under habeas review.  See Keller v. Larkins, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence"); Hickey v. Jeffes, 571 F.2d 762, 766 (3d Cir. 1978) ("As to the contention that the trial court erred in admitting the victim's testimony of a prior flirtatious conversation, we find that, if there was any error in the court's ruling . . . that error was at best one of interpretation of the state's law of evidence and did not arise to constitutional

---

[9] Petitioner's defense counsel objected to admission of the photograph; Petitioner's trial judge overruled the objection, explaining as follows:

> The Rule 403 provides that relevant evidence can be excluded where it appears that its probative value is substantially outweighed by the risk of undue prejudice.  I find that the defense has not met its burden in establishing the potential for prejudice outweighs the probative value for a variety of reasons. First, it is highly probative evidence because it does establish purposeful or knowing and goes toward establishing purposeful and knowing given the nature of the injuries, their locale, their size, their effect.  In addition, the nature of the injuries doesn't seem to conform with or arguably conform with the defendant's statement.  In addition, there will be some testimony elicited I'm told from Dr. Gross with reference to the weapon he used and whether or not the weapon was consistent with the nature of the wounds inflicted.  There was a suggestion in the statement that in some manner the defendant did not inflict the fatal wound, that there was someone else involved.  It is important; given those circumstances, that Dr. Gross testify to the nature of the wounds and that the jury have available to it the single photograph the State seeks to admit reflecting those wounds. . . .  Obviously, in any murder case, there's a potential for a reaction by jurors when the nature of the wounds inflicted are described.  But I don't see where there's anything about the one single photograph that the State seeks to admit showing the wounds that would in any way be inflammatory over and above the descriptions that have already been given of the events that occurred.

Docket Entry No. 17-10, at 9-11 (discussion of state law omitted).

dimensions"). In <u>Estelle v. McGuire</u>, 502 U.S. 62, the Supreme Court held that the state court's

admission in petitioner's trial for murdering his infant daughter of the testimony of two

physicians that the child had suffered incidents of child abuse prior to the murder (evidence of

rectal tearing that was six weeks old and rib fractures that were seven weeks old) did not violate

due process.

> The evidence of battered child syndrome was relevant to show intent, and nothing
> in the Due Process Clause of the Fourteenth Amendment requires the State to
> refrain from introducing relevant evidence simply because the defense chooses
> not to contest the point. Concluding, as we do, that the prior injury evidence was
> relevant to an issue in the case, we need not explore [any] assumption . . . that it is
> a violation of the due process guaranteed by the Fourteenth Amendment for
> evidence that is not relevant to be received in a criminal trial. [Once the issue of
> relevance has been established, w]e hold that [the petitioner's] due process rights
> were not violated by the admission of the evidence.

<u>Id.</u> at 70.[10]

Therefore, Petitioner's Ground Four challenges will be dismissed, since: (a) the

photographs were facially relevant, <u>see</u> this Opinion, note 10; and (b) thus, the state courts'

findings as to this claim were not contrary to the governing Supreme Court precedent.

_____

[10]   In cases *not governed* by the AEDPA, the Third Circuit has held that the admission of
evidence may violate due process where the evidence are so inflammatory to "undermine[d] the
fundamental fairness of the entire trial." <u>Keller v. Larkins</u>, 251 F. 3d 408, 413 (3d Cir. 2001);
<u>see</u> <u>also</u> <u>Lesko v. Owens</u>, 881 F. 2d 44, 51 (3d Cir. 1989) ("the erroneous admission of evidence
that is relevant, but excessively inflammatory, might rise to the level of a constitutional
violation"); <u>Bisaccia v. Attorney General of State of New Jersey</u>, 623 F. 2d 307, 313 (3d Cir.
1980) (when "the probative value of . . . evidence, though relevant, is greatly outweighed by the
prejudice to the accused from its admission, then use of such evidence by a state may rise to the
posture of fundamental fairness and due process of law"). However, Section 2254(d)(1) of the
AEDPA does not permit this Court to grant habeas relief based on Third Circuit – or any circuit
court's – precedent. Moreover, the admission of evidence challenged by Petitioner in this action
cannot meet the Third Circuit standard in any event: here, Petitioner's allegations express merely
his displeasure with admission of evidence do not indicate that the photograph of Connor's dead
body was so inflammatory that the very substantial probative value of the photograph was
greatly outweighed by the hypothetical prejudice the jurors might have developed upon its
admission.

### E.      Ground Five

In his Ground Five, Petitioner asserts that the jury charge given by his trial court violated

his rights under the Fifth and Fourteenth Amendments.  Respondents duly observe that

> Petitioner does not specify what portions of the trial court's charge he finds
> inappropriate.  However, given that Petitioner's first five grounds for relief
> correspond exactly to the first five points raised in his direct appeal to the
> Superior Court of New Jersey, Appellate Division, it is not unreasonable to
> assume that Petitioner's argument is as the Appellate Division stated[,
> "Petitioner] contends that the judge mischarged the jury on a crucial legal concept
> and incorrectly responded to a jury request for clarification, thereby 'infect[ing]
> the entire course of the jury's deliberations."

Docket Entry No. 11, at 20.  The Court finds Respondents' assumption reasonable. [11]

A jury instruction, even if inconsistent with state law, does not merit federal habeas

relief.  Where a federal habeas petitioner challenges jury instructions given in a state criminal

proceeding,

> the only question for [federal courts sitting in habeas review] is "whether the
> ailing instruction by itself so infected the entire trial that the resulting conviction
> violates due process."  It is well established that the instruction "may not be
> judged in artificial isolation," but must be considered in the context of the
> instructions as a whole and the trial record.  In addition, in reviewing an
> ambiguous instruction . . . , [federal courts] inquire "whether there is a reasonable
> likelihood that the jury has applied the challenged instruction in a way" that
> violates the Constitution.  And we also bear in mind our previous admonition that
> [federal courts] "have defined the category of infractions that violate 'fundamental
> fairness' very narrowly."  "Beyond the specific guarantees enumerated in the Bill
> of Rights, the Due Process Clause has limited operation."

---

[11]  The Court also notes, in passing, that Petitioner's factless Ground Five challenges fail
to meet habeas pleading requirement.  "Habeas corpus petitions must meet heightened pleading
requirements."  McFarland v. Scott, 512 U.S. 849, 856 (1994).  Habeas Rule 2(c) requires a §
2254 petition to, inter alia, "specify all the grounds for relief available to the petitioner" and
"state the facts supporting each ground."  28 U.S.C. § 2254 Rule 2(c).  However, since Petitioner
should have exhausted in the state courts all his current federal challenges, and Petitioner did, in
fact, exhaust the challenges Respondents assume to be the ones raised in Petitioner's Ground
Five, this Court finds it warranted to read the requirements of Habeas Rule 2(c) leniently and,
thus, to equate Petitioner's Ground Five with the challenges presumed by Respondents.

Estelle v. McGuire, 502 U.S. at 72-73.

Therefore, the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law." Smith v. Horn, 120 F.3d 400, 416 (3d Cir. 1997); see also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

Here, the Appellate Division detailed Petitioner's challenges presented to the state courts and the rationale for state court's findings as follows:

> [Petitioner] first contends that giving a flight charge was improper because "almost by definition the concept of 'flight' impels a jury to lean towards conviction." [Petitioner] objected to the flight charge during the charge conference, arguing that "just leaving the scene of a crime" is not evidence of flight, and if it were, there "would be a flight charge it every case that a person wasn't arrested at the scene of the crime." The State argued that by [Petitioner's] own admission, he ran an "obstacle course" to avoid apprehension. [Petitioner] countered that leaving the scene of the crime is not the same as leaving the state, for instance. The judge agreed with the State and thereafter gave the following "flight" charge:

>> There has been some testimony in the case from which you may infer that the defendant fled shortly after the alleged commission of the crime. The question of whether the defendant fled after the commission of the crime is another question of fact for your determination. Mere departure from a place where a crime has been committed does not constitute flight. If you find that the defendant, fearing that an accusation or arrest would be made against him on the charges involved in the incident, took refuge in flight for the purpose of evading the accusation or arrest on the charge, then you may consider such flight in connection with all the other evidence in the case, as an indication or proof of consciousness of guilt. *Flight may only be considered as evidence of consciousness of guilt if you should*

> determine [*as a prerequisite*] *that the defendant's purpose in leaving was*
> *to evade accusation or arrest for the offenses charged in the indictment*.
> If, after consideration of all of the evidence, you find that the defendant,
> fearing that an accusation or arrest would be made against him on the
> charges involved in the indictment, took refuge in flight for the purpose of
> evading the accusation or arrest, then you may consider such flight in
> connection with all the other evidence in the case, as an indication of
> proof of a consciousness of guilt.  It is for you as judges of the facts to
> decide whether or not evidence of flight show a consciousness of guilt,
> and then the weight to be given such evidence in light of all the other
> evidence in the case.

"Flight of an accused is admissible as evidence of consciousness of guilt, and
therefore of guilt."  State v. Long, 119 N.J. 439, 499 (1990).  Mere departure from
the crime scene does not imply guilt. . . .  Here, [Petitioner's] actions were in
leaving the crime scene.  The fact that he sought two exit from the Firehouse
Tavern and then ran away is not persuasive.  He remained in the immediate area,
apparently wandered the streets, and went to work the next morning.  His actions
do not appear to indicate a hiding or a flight evidencing a consciousness at guilt
on the level shown in the cases that approved a flight charge.  However, even if
[Petitioner's] actions did not raise a jury question on flight, giving the charge to
the jury was harmless error . . . .  First, the charge itself gave the jury the right to
consider whether [Petitioner's] actions actually constituted flight and it may well
be that the jury concluded his actions did not.  But even if the jury did find that
"flight" was indicative of  [Petitioner's] guilt, that finding could not have led the
jury to a result it might otherwise nor have reached.  The evidence of his guilt,
including a detailed confession, was overwhelming.  Without evidence of flight,
the result would likely have been the same.  Thus, even if error, it was not
reversible error.

Next [Petitioner] contends that the judge inappropriately responded to the jury a
request for clarification on the separate robbery charge against him, a charge that
the judge ultimately dismissed.  The dismissal of [this charge] by the judge . . .
makes this point moot.  It is inconceivable that the inclusion of [this] count
tainted the rest of the jury a verdicts, especially in light of the fact that the jury
would have been charged on the robbery count concerning James.  [Petitioner's]
argument on this point is without merit.

Docket Entry No. 11-12, at 31-34 (emphasis supplied).

As the Appellate Division's discussion illustrates, no statement made by Petitioner's trial

judge during the jury instructions operated in a fashion lifting the burden of proof on an essential

27

element of an offense with regard to which Petitioner was *actually* convicted.  See Smith v. Horn, 120 F.3d at 416.  Therefore, any "surplus" instructions included by the trial judge could be qualified, at most, as errors in application of state law, which falls outside federal habeas review. See Estelle, 502 U.S. at 72-73.  Correspondingly, the state courts' findings dismissing Petitioner's above-detailed challenges were not an unreasonable application of Supreme Court precedents, and Petitioner's Ground Five will be dismissed as not meriting habeas relief.

> **F.  Ground Seven**

>> **1.  *Challenges Raised Before the State Courts***

Addressing Petitioner's challenges related to the comments made during his trial by the prosecutor, the Appellate Division stated as follows:

> [Petitioner] contends that the judge should have granted his new trial motion based on prosecutorial misconduct.  The State maintains that the prosecutor's statements throughout the trial were within the bounds of permissible comment and, therefore, did not constitute prosecutorial misconduct.  In determining whether prosecutorial misconduct is prejudicial and denied defendant a fair trial, we consider whether defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court ordered the remarks stricken from the record and instructed the jury to disregard them. "Prosecutorial misconduct is not ground for reversal of a criminal conviction unless the conduct was so egregious that it deprived defendant of a fair trial." . . .

> [Petitioner] argues that the prosecutor engaged in "a deliberate and calculated maneuver to denigrate the doctors presented by the defense in the eyes of the jury."  He objects to the following excerpted portion we have emphasized by underlining in the summation where the prosecutor discussed the amount of cocaine allegedly ingested by [Petitioner] and how the reported amount changed from [Petitioner's] meeting with Weiss to his later meeting with Rosenberg:

>> I confront Rosenberg, well you'll agree with me, won't you, that mysteriously [Petitioner] reports the ingestion of cocaine to you that more than doubles what he reports to Dr. Weiss.  And he knew, [Petitioner], that based on what he told or Weiss, Dr. Weiss concluded no intoxication defense here.  I ask him, gee, Flint Flam Fred, remember, the guy who you find at every opportunity is trying to con people, admits that when he first

went to the police he tried to con them, to talk them out of his being involved in this incident.   Gee, based upon all of that do you have any question about is Freddie being honest to me about the amount that s being ingested?  Oh no, I still you know, believe that Fred's told by Dr. Weiss 10 to 14 bags won't do it, and so what does he tell Dr Rosenberg?  Twenty to 24.  And bingo, we've got a winner here.

<u>Ladies and gentlemen, the use of that testimony, the opinions of that doctor Rosenberg in this case are the most glaring example I have ever seen of the misuse of the profession of forensic psychiatry.  Remember I had them talk a little bit about the manual that they use and the warning with respect to it that it warns of the misuse and misapplication of that philosophy and that science in forensic context.  That was the clearest, most unequivocal example of its misuse that anyone cou1d be exposed to.</u>  Dr. One, no, there's not enough there.  Dr. Two, okay, with twice as much now, I'll believe that and now we have the defense in the case.

At the conclusion of the summation, [Petitioner] requested an instruction to the jury "relating to the psychiatrist saying that he acted unethically, that he violated the canons of his profession."  He then asked for a mistrial.  The prosecutor countered that the comment was fair because he:

> had established in my cross-examination of Dr. Rosenberg, in particular about whom I directed those comments, that he had clearly and unequivocally misused the evidence in this case, chose to reject clear evidence establishing other than what his patient was telling him, and offered opinions based upon evidence that was uncorroborated and discredited everywhere else.

The judge ruled that although the prosecutor's comments were "harsh," they were "fair comment based on the testimony elicited from Dr. Rosenberg as to the dates that he met with [Petitioner], as to the changes in the information that [Petitioner] provided to him as opposed to Dr. Weiss.  Noting that it was an unique situation for the defense to present differing experts, and under "those unique circumstances, I do believe there was nothing objectionable about what the State said today in closing."

At the motion for a new trial, made in part based on the prosecutor's comments, the judge admitted being troubled since the trial about the prosecutor's comments.  Nevertheless, the judge concluded:

> Doctor Rosenberg's testimony was so troubling in and of itself, that it reduces the legal significance of the statement by the prosecutor which might otherwise have had great legal significance.   However, Doctor Rosenberg clearly was a novice as a forensic expert.  He clearly

29

acknowledged Doctor Weiss's well recognized competence in the field and the fact that [Dr. Rosenberg's] opinion just seemed to fly in the face of everyone else's, set up and justified the remarks that were made by the prosecutor regarding the entire lack of merit of doctor Rosenberg's testimony. It was arguably fair comment and if not fair comment, in light of the overwhelming weight of the evidence, it could not have had an impact upon the jury that would have led to an unjust result, or that would compel me to grant an application to set aside the jury's verdict. The evidence in this case was so overwhelming, so detailed, so substantial, that the comment is simply insignificant in comparison to that evidence.

[Petitioner] claims that the prosecutor's comments amounted to a "needless and directly personal attack on the doctors [which] could only have been intended to sway the jury to considering the doctors' testimony as nonsense and itself an attempt to 'hoodwink' the jury." However, [Petitioner] offers no authority for his proposition that the prosecutor's comments were improper. The judge, after reflection, was uncomfortable with the comments, but was not convinced that they were unfair under the circumstances. We cannot conclude that the prosecutor's remarks were improper. But even if they were, we agree with the judge that the evidence of guilt was so overwhelming that the comments did not deprive [Petitioner] of a fair trial.

[Petitioner] also objects to the prosecutor's placing an outline for his closing on the blackboard in the courtroom labeled "Defenses," and characterizing [Petitioner's] various defenses as "Plan A," "Plan B," and "Plan C." [Petitioner] objected to the characterization as "plans." The judge approved the prosecutor's suggestion that he would tell the jury that use of the word "plan" was the functional equivalent of the word "theory." In his closing, the prosecutor referred to "Plan A, or theory A," "plan B or theory B" and "theory C or plan C."

On appeal [Petitioner] claims that "by using the word 'plans' the prosecutor was making it seem as if defense counsel was merely using artificial gamesmanship and ploys instead of setting forth legitimate defenses to the crimes charged." While citang no authority for his claims, [Petitioner] asserts this "made light of and poked fun at the defense and tried to instill a mind set in the jury not to take the defenses seriously."

Although the word "plan" could have a slightly different connotation than the word "theory," we are satisfied here that the use of the word "plan" was not an egregious abuse by the prosecutor. In light of the overwhelming evidence of guilt, the use of the word "plan" could not have swayed the jury to pursue a course it otherwise would not have taken. Hence, the comments did not deprive [Petitioner] of a fair trial, and there was no abuse of discretion in refusing to grant a new trial on that basis.

Docket Entry No. 11-12, at 38-43 (citations to state law omitted, original brackets removed, emphasis by the means of underlining in original).

2.   *Challenges Raised In This Action*

Petitioner's Ground Seven raised in this action was not duly exhausted in state courts.

Exhaustion of state remedies has been required for more than a century, since the Supreme Court's decision in <u>Ex parte Royall</u>, 117 U.S. 241 (1886).  The exhaustion doctrine was first codified at 28 U.S.C. § 2254 in 1948, <u>see</u> <u>Rose v. Lundy</u>, 455 U.S. 509, 516-18 (1982), and more recently was the subject of significant revisions in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. 104-132, 110 Stat. 1217 (April 24, 1996).  The exhaustion requirement is intended to allow state courts the first opportunity to pass upon federal constitutional claims, in furtherance of the policies of comity and federalism.  <u>Granberry v. Greer</u>, 481 U.S. 129 (1987); <u>Rose v. Lundy</u>, 455 U.S. 509, 516-18 (1982). The  petitioner bears the burden of proving all facts establishing exhaustion.  <u>See</u> <u>Toulson v. Beyer</u>, 987 F.2d 984, 987 (3d Cir. 1993).  This means that the claims heard by the state courts must be the "substantial equivalent" of the claims asserted in the federal habeas petition, in other words, *the legal theory and factual predicate must be materially the same*.  <u>See</u> <u>Picard v. Connor</u>, 404 U.S. 270, 275-77 (1971).

Here, Petitioner's challenges raised before the state courts addressed the trial judge's decision to deny Petitioner's motion for new trial; in that respect, Petitioner's challenges raised legal theory invoking considerations addressed by this Court with regard to Petitioner's Grounds Three and Six.  In contrast, in his current Ground Seven, Petitioner now challenges not the

determination reached by his trial judge but the comments made by the prosecutor, hence invoking a qualitatively different legal standard.

However: (a) while – as a general rule – the district court must dismiss a "mixed" petition, that is, if presented with a habeas petition consisting of both exhausted and unexhausted claims, or allow petitioner to withdraw his unexhausted claims, the court may resolve a mixed petition, in its entirety, on merits if all unexhausted grounds fail to present a colorable federal claim, see 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); Lambert v. Blackwell, 134 F.3d 506, 515 (3d Cir. 1997) (district court may deny an unexhausted petition on the merits under § 2254(b)(2) "if it is perfectly clear that the applicant does not raise even a colorable federal claim"); and (b) the above-quoted excerpt of the Appellate Division's determination substantively addressed Petitioner's instant challenges based on the prosecutor's comments in addition to Petitioner's derivative claim raised against his trial judge.

Where a prosecutor's remarks are challenged in habeas, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)).  In evaluating the likely effect of improper comments, a court may consider whether the improper comments were invited by the particular circumstances of the trial.  Cf. Darden, 477 U.S. at 181-82.  Thus, "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's [challenged comment] in

context and in light of the entire trial, assessing the severity of the conduct." <u>Moore v. Morton</u>, 255 F.3d 95, 107 (3d Cir. 2001).

In Petitioner's case, Petitioner's defense presented findings of different expert witnesses testifying for the defense; however, Doctor Rosenberg's findings were not only contrary to the findings of Petitioner's other expert witnesses (especially, Dr. Weiss' findings): Doctor Rosenberg's conclusions were unscrupulously based on Petitioner's factual statements that were: (a) given by Petitioner to Doctor Rosenberg after Petitioner's original statements were already deemed (by Dr. Weiss) not warranting defense based on lack of mental capacity; and (b) differed materially and dramatically as to Petitioner's factual assertions with regard to the amount of controlled substance Petitioner allegedly consumed right prior to committing the crime (<u>i.e.</u>, Petitioner changed his factual position to allege that he consumed nearly twice as much controlled substance in comparison with the amount of controlled substance he asserted to Dr. Weiss).

In light of the foregoing, this Court finds the conclusions reached by the trial court and the Appellate Divisions not an unreasonable application of Supreme Court precedent.  While the prosecutor's choice of words was, perhaps, not the best one, the gist of the prosecutor's comments about Doctor Rosenberg's unscrupulous decision not to question the dramatic difference between the facts asserted by Petitioner to him and to Doctor Weiss (and Dr. Rosenberg's resulting decision to adopt, wholesale and without questioning, Petitioner's dramatically amplified factual assertions as true) effectively invited the prosecutor's comments. Since the overall content of the prosecutor's comments is legally valid, the less-than-perfect

prosecutor's choice of words, in and by itself, cannot amount to statements crossing the constitutional boundaries.

The same applying to the prosecutor's decision to refer to the defense's alternative theories as "plans,"  did not so infect the trial with unfairness "as to make the resulting conviction a denial of due process."[12] Darden, 477 U.S. at 181; Donnelly, 416 U.S. 637.

Therefore, Petitioner's Ground Seven claims will be dismissed, as not warranting habeas relief.

**G.    Ground Eight**

_____

[12]  This is particularly so in light of the instruction given to the jurors by Petitioner's trial judge, who directed the jury as follows:

> And in this case we had a number of expert witnesses. They include Dr. David Bogacki, Harold Lansoni, Dr. Weiss, George Jackson, Dr. Rosenberg and Dr. Gross.  These notes, by the way, were taken from my handwriting.  And if I omitted a doctor or added a doctor somewhere, that was just an unintentional product of my nearly illegible handwriting.  Folks, you are not bound by such experts' opinion; but you should consider each opinion and give it the weight to which you deem it is entitled, whether that weight be great or slight, or you may reject it.  In examining each opinion, you may consider the reason given for it, if any, and you may also consider the qualifications and the credibility of th expert.  It is always within the special function of the jury to decide whether the facts on which the answer of an expert is based actually exists, and the value or weight of the opinion the expert is dependent upon and no stronger than the facts which it is predicated. In resolving any conflict that may exist in the testimony of expert witnesses, you must weigh one expert's opinion against that of the other.  And you must consider the reasons given by one as compared with those of the other.  And you should consider the relative credibility and knowledge of the experts who have testified. Thereupon, you should find in favor of that expert testimony which, in your opinion, is entitled to the greater weight. Nevertheless, you must always keep in mind that the State has the burden of proving the crime and each of its elements beyond a reasonable doubt.

Docket Entry No. 19-3, at 12-13.

In his Ground Eight, Petitioner asserts that the cumulative of the errors committed during his criminal proceedings denied him a fair trial.

Under traditional due process principles, cumulative error warrants habeas relief only where the errors have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence on the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1992) (internal quotations omitted). Simply put, only where the combined effect of errors renders a criminal defense "far less persuasive than it might [otherwise] have been" will the resulting conviction violate due process. Chambers v. Mississippi, 410 U.S. 284, 302-03 (1973). Thus, a habeas petitioner is not entitled to relief based on cumulative errors unless (s)he demonstrates "actual prejudice." See Murray v. Carrier, 477 U.S. 478, 494 (1986); accord Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008) (explaining that "actual prejudice" must be established by the petitioner's showing that the errors during the trial created more than a hypothetical possibility of prejudice).

Here, Petitioner does not make any assertions suggesting actual prejudice, and this Court, after carefully examining the extensive underlying record, cannot find any aspect of Petitioner's trial suggesting, singularly or cumulatively, anything more than a hypothetical possibility of prejudice. Correspondingly, Petitioner's Ground Eight challenges do not merit habeas relief, since the state court's dismissal of Petitioner's cumulative error argument was not an unreasonable application of Supreme Court precedent.

**H.     Grounds Nine and Eleven**

35

In his Ground Nine, Petitioner challenges the circumstances of his arrest. While Respondents maintain that Petitioner's arrest was conducted upon probable cause, this argument has no place in this habeas matter. To the degree Petitioner's Ground Nine can be construed as a claim raising Miranda challenges or as challenges based on admissibility of his confession tape, Petitioner's Ground Nine is subject to dismissal as duplicative of Petitioner's above-discussed meritless Grounds One and Two, which already raised these very claims. In all other respects, Petitioner's Ground Nine is subject to dismissal without prejudice to a non-habeas challenge.[13] See Foster v. Albino, 2009 U.S. Dist. LEXIS 36355, at *13 (D.N.J. Apr. 28, 2009) (addressing the same scenario).

Petitioner's Ground Eleven turns of the finesse of Petitioner's indictment and grand jury proceedings. This ground is facially without merit. The Fifth Amendment right to an indictment by a grand jury does not apply to state criminal prosecutions. See Apprendi v. New Jersey, 530 U.S. 466, 477 n.3 (2000); Albright v. Oliver, 510 U.S. 266, 272 (1994); Hurtado v. California, 110 U.S. 516 (1884). Because the Due Process Clause of the Fourteenth Amendment has not been construed to incorporate the Fifth Amendment right to indictment by a grand jury, see id., the legality of an indictment is a matter of state law, see U.S. Wojtycha v. Hopkins, 517 F.2d 420, 425 (3rd Cir. 1975).[14] Accordingly, "there is no federal constitutional impediment to

---

[13] The Court stresses, however, that no statement made in this Memorandum Opinion shall be construed as expressing this Court's position as to substantive or procedural validity (or invalidity) of Petitioner's civil rights challenges based on the circumstances of his arrest.

[14] Moreover, under New Jersey law, prosecutors are not generally required to provide the grand jury with evidence on behalf of the suspect, see State v. Hogan, 144 N.J. 216, 235 (1996), and an indictment should be disturbed only on the clearest and plainest ground. See State v. Womack, 145 N.J. 576, 588 (1996). Such a duty is triggered "only in the rare case in which the prosecutor is informed of evidence that both directly negates the guilt of the accused and is

(continued...)

dispensing entirely with the grand jury in state prosecutions." Beck v. Washington, 369 U.S. 541, 545 (1962); see also Gerstein v. Pugh, 420 U.S. 103, 118-119 (1975) ("the accused is not entitled to [federal] judicial oversight or review of the decision to prosecute"). State prosecutions may be "instituted on informations filed by the prosecutor, on many occasions without even a prior judicial determination of 'probable cause' – a procedure which has likewise had approval [of the Supreme Court] in such cases as Ocampo v. United States, 234 U.S. 91 (1914), and Lem Woon v. Oregon, 229 U.S. 586 (1913)." Beck v. Washington, 369 U.S. at 545; accord Rose v. Mitchell, 443 U.S. 545, 576 (1979) ("There is no constitutional requirement that a state criminal prosecution even be initiated by a grand jury"). Since Petitioner's Ground Eleven does not assert cognizable federal claims, Petitioner is not entitled to habeas relief on the basis of this ground.

For these reasons, Petitioner's Grounds Nine and Eleven will be dismissed.

## I.     Ground Ten

Petitioner's Ground Ten asserts that the part of Detective McLaughlin's testimony detailing the process of Petitioner giving his confession and McLaughlin audiotaping that confession had to be presented to the jurors.

> [W]e have stated that the Constitution permits judges "to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" Crane[v. Kentucky, 476 U.S. 683,] 689-690 [(1986)] (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986), ellipsis and brackets in original)[; s]ee also Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (plurality opinion) (terming such rules "familiar and unquestionably constitutional").

---

[14](...continued)
clearly exculpatory," Hogan, 144 N.J. at 237, which was not Petitioner's scenario.

Holmes v. South Carolina, 126 S. Ct. at 1731-33 (2006).[15]

> The Compulsory Process clause protects the presentation of the defendant's case from unwarranted interference by the government, be it in the form of an unnecessary evidentiary rule, a prosecutor's misconduct, or an arbitrary ruling by the trial judge. . . . But the right is not absolute. The Sixth Amendment requires more than a mere showing by the accused that some . . . evidence was excluded from his trial. Rather, the accused must show how that testimony would have been both material and favorable to his defense. . . . Evidence is material: "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." . . . In United States v. Bagley, 473 U.S. 667 (1985), the Court further refined the materiality definition by noting that, "[a] 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682. In sum, for a defendant to establish that he was convicted in violation of his Sixth Amendment right to compulsory process, he must show: First, that he was deprived of the opportunity to present evidence in his favor; second, that the excluded testimony would have been material and favorable to his defense; and third, that the deprivation was arbitrary or disproportionate to any legitimate evidentiary or procedural purpose. [See] Rock v. Arkansas, 483 U.S. 44, 56 (1987).

Government of the Virgin Islands v. Mills, 956 F.2d 443, 445-46 (3d Cir. 1992) (original brackets removed, footnote omitted).[16]

Here, Petitioner asserts that either the prosecutor or his defense counsel should have sought an opportunity to provide the jurors with the omitted parts of McLaughlin's testimony reflecting on the process of Petitioner's confession; Petitioner's allegations indicate his hope that – had jurors been given this omitted part of transcript – the jurors might have: (a) concluded that Petitioner's confession was unduly obtained in violation of Petitioner's Miranda rights or that the confession was insufficiently taped to meet the requirements of state rules of evidence; and (b)

---

[15] Violations of the right to present a defense are subject to harmless error review. See, e.g., Van Arsdall, 475 U.S. at 680-84; Savage v. District Attorney of the County of Philadelphia, 116 Fed. App'x 332 (3d Cir. 2004).

[16] The Court of Appeals noted that some courts analyze such claims under the Due Process Clause and that there is little, if any, difference in the analysis. See Mills, 956 F.2d at 445 n.4.

elected to second-guess the trial judge's decision that Petitioner's confession was admissible and, upon such election, might have ignored the content of Petitioner's confession.  However, the issues of admissibility were already resolved by Petitioner's trial judge as a matter of law, and Petitioner had no constitutional right to have his trial judge's evidentiary findings "second-guessed" by his jurors.  Indeed, for the purposes of Petitioner's trial proceedings before the jury, the omitted evidence was irrelevant and, moreover, this evidence neither could affect – nor should have affected – the judgment of the trier of fact.  Correspondingly, the fact that this evidence was not presented to the jurors cannot serve as a viable basis for habeas relief, and Petitioner's Ground Ten will be dismissed accordingly.

### J.      Ground Twelve

In his Ground Twelve, Petitioner returns, once again, to the issue of his jury charge and maintains that his trial judge erroneously charged the jurors that they did not have to reach a unanimous verdict.  This Ground Twelve appears wholly unexhausted: the Court carefully examined Petitioner's appellate briefs and briefs filed during the post-conviction review ("PCR") proceedings, and could not locate a single claim resembling, even remotely, Petitioner's Ground Twelve.  However, since Petitioner's Ground Twelve is facially without merit, this Court – pursuant to § 2254(b)(2) – will dismiss it on merits regardless of Petitioner's failure to exhaust this line of challenges.

Petitioner's trial judge gave the jurors an exceedingly lengthy charge, with the part related to the crimes of murder and manslaughter reading as follows:

> Now the defendant is charged by indictment with the murder of Robert Connors.
> Count one of the indictment reads that [Petitioner] purposely or knowingly by his
> own hand caused the death of Robert Connors, or did purposely or knowingly by
> his own hand inflict bodily injury upon Robert Connors, resulting in his death.  A

person is guilty of murder it he, one, purposely causes death or serious bodiy injury resulting in death; or, two, knowingly causes death or serious bodily injury resulting in death.  In order for you to find the defendant guilty of murder, the State is required to prove each of the following elements beyond a reasonable doubt.  That the defendant caused Robert Connors' death or serious bodily injury resulting in death; and secondly, that be did so purposely or knowingly.  One of the elements that the State must prove beyond a reasonable doubt is that the defendant acted purposely or knowingly.  A person who causes another's death does so purposely when it is the person's conscious object to cause death or serious bodily injury resulting in death.  A person who causes another's death does so knowingly when the person is aware that it is practically certain that his conduct will cause death or serious bodily injury resulting in death.  The nature of the purpose or knowledge with which the defendant acted towards Connors as a question of fact for you the jury to decide.  Purpose and knowledge are conditions of the mind which cannot be seen, and can only be determined by inferences from conduct, words or acts.  It is not necessary for the State to produce a witness or witnesses who could testify that the defendant stated, for example, that his purpose was to cause death or serious bodily injury resulting in death, or that he knew that his conduct would cause death or serious bodily injury resulting in death.  It is within your power to find that proof of purpose or knowledge has been furnished beyond a reasonable doubt by inference which may arise from the nature of the acts and the surrounding circumstances.  Such things as the place where the acts occurred, the weapon used, the location, number and nature of wounds inflicted, and all that was done or said by the defendant preceding, connected with and immediately succeeding the events leading to Connors' death are among the circumstances to be considered.  Although the State must prove that the defendant acted either purposely or knowingly, the State is not required to prove a motive.  If the State has proven the essential elements of the offense beyond a reasonable doubt, the defendant must be found guilty of that offense regardless of his motive or lack of motive.  If the State, however, has proved a motive, you may consider that insofar as it gives meaning to other circumstances.  On the other hand, you may consider the absence of motive in weighing whether or not the defendant is guilty of the crime charged.  A homicide or a killing with a deadly weapon, such as a knife, in itself would permit you to draw an inference that the defendant's purpose was to take life or cause serious bodily injury resulting in death.  A deadly weapon is any firearm or other weapon or device which, in the manner it is used or is intended to be used, is known to be capable of producing death or serious bodily injury.  In your deliberations, you may consider the weapon used and the manner and circumstances of the killing.  And if you are satisfied beyond a reasonable doubt that the defendant stabbed and killed Robert Connors with a knife, you may draw an inference from the weapon used; that is, the knife, and from the manner and circumstances of the killing as to the defendant's purpose and knowledge.  The other element that the State must prove beyond a reasonable doubt is that the defendant caused Robert Connors'

death, or serious bodily injury resulting in death.  Serious bodily injury means bodily injury which creates a substantial risk of death, or which causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ. Whether the killing is committed purposely or knowingly, causing death or serious bodily injury resulting in death, must be within the design or contemplation of the defendant.  If you determine that the State has proven beyond a reasonable doubt that the defendant purposely or knowingly caused death or serious bodily injury resulting in death, you must find the defendant guilty of murder.  If, on the other hand, you determine that the State has not proven beyond a reasonable doubt that the defendant purposely or knowingly caused death or serious bodily injury resulting in death, then you must find him not guilty of murder, and go on to consider whether the defendant should be convicted of the crimes of aggravated or reckless manslaughter.  A person is guilty of aggravated manslaughter if he recklessly causes the death of another person under circumstances manifesting extreme indifference to human life.  In order for you to find the defendant guilty of aggravated manslaughter, the State is required to prove each of the following elements beyond a reasonable doubt. First, that the defendant caused Connors' death; and, secondly, that he did so recklessly; and, third, that the defendant did so under circumstances manifesting extreme indifference to human life.  One element that the State must prove beyond a reasonable doubt is that the defendant acted recklessly.  A person who causes another's death does so recklessly when he is aware of and consciously disregards a substantial and unjustifiable risk that death will result from his conduct.  The risk must be of such a nature and degree that considering the nature and purpose of defendant's conduct, and the circumstances known to defendant, his disregard of that risk is a gross deviation from the standard of conduct that a reasonable person would follow in the same situation.  In other words, you must find that defendant was aware of and consciously disregarded the risk of causing death.  If you find that defendant was aware of and disregarded the risk of causing death, you must determine whether the risk that he disregarded was substantial and unjustifiable.  In doing so you must consider the nature and purpose of defendant's conduct, and the circumstances known to defendant.  And you must determine whether, in light of those factors, defendant's disregard of that risk was a gross deviation from the conduct a reasonable person would have observed in his situation.  Another element that the State must prove beyond a reasonable doubt is that the defendant acted under circumstances manifesting extreme indifference to human life.  That phrase, under circumstances manifesting extreme indifference to human life, does not focus on his state of mind, but rather on the circumstances under which you find he acted.  If, in light of all the evidence, you find that the defendant's conduct resulted in a probability, as opposed to a mere possibility of death, then you may find that he acted under circumstances manifesting extreme indifference to human life.  On the other hand, if you find that his conduct resulted in only a possibility of death1 then you must acquit him of aggravated manslaughter and consider the offense of reckless

41

manslaughter which I will now explain to you, or shortly. The final element that the State must prove beyond a reasonable doubt is that the defendant caused Connors' death. In other words, you must find that Connors would not have died, but for defendant's conduct. So in order to find a person guilty of aggravated manslaughter, the three elements are that the defendant caused Connors' death, that he did so recklessly, that he did so under circumstances manifesting extreme indifference to human life. If, however, after consideration of all the evidence you are not convinced beyond a reasonable doubt that he acted recklessly, under circumstances manifesting extreme indifference to human life, you must find him not guilty of aggravated manslaughter and go on to consider whether he should be convicted of reckless manslaughter. A person is guilty of reckless manslaughter if he recklessly causes the death of another. In order for you to find the defendant guilty of reckless manslaughter, the State is required to prove two elements. First, that the defendant caused Connors' death; and secondly, that he did so recklessly. One element that the State must prove beyond a reasonable doubt is that he acted recklessly, and a person who causes another's death, does so recklessly when he is aware of and consciously disregards a substantial and unjustifiable risk that death will result from his conduct. The risk must be of such a nature and degree that considering the nature and purpose of defendant's conduct, and the circumstances known to him, his disregard of that risk is a gross deviation from the standard of conduct that a reasonable person would follow in the same situation. In other words, you must find that he was aware of and consciously disregarded the risk of causing death. If you find that defendant was aware of and disregarded the risk of causing death, you must determine whether that risk that he disregarded was substantial and unjustifiable. In doing so, you must consider the nature and purpose of his conduct, the circumstances known to him, and you must determine whether, in light of those factors, his disregard of that risk was a gross deviation from the conduct a reasonable person would have observed in his situation. The other element that the State must prove beyond a reasonable doubt is that the defendant caused Connors' death. In otter words, you must find that Connors would not have died, but for the defendants conduct. If, after consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant recklessly caused Connors' death, then your verdict should be guilty of reckless manslaughter. if, however, after consideration of all the evidence you are not convinced beyond a reasonable doubt that the defendant recklessly caused Connors' death, you must find the defendant not guilty of reckless manslaughter. To find defendant guilty of murder, all jurors must unanimously agree that defendant purposely or knowingly caused death, or that he purposely or knowingly caused serious bodily injury resulting in death, with reckless indifference as to whether his conduct would cause death, or that he purposely or knowingly caused serious bodily injury resulting in death. But all jurors do not have to agree unanimously as to which form of murder is present, so long as all jurors unanimously believe it was one form of murder or another. However, for a defendant to be subject to capital punishment, all jurors must

unanimously agree that the defendant either purposely or knowingly caused death or serious bodily injury resulting in death, while demonstrating reckless indifference as to whether his conduct would cause death.  If you are unable to unanimously agree on the one hand as to whether defendant purposely or knowingly caused death or serious bodily injury resulting in death, with reckless indifference as to whether his conduct would cause death, or on the other hand, as to whether he purposely or knowingly caused serious bodily injury resulting in death, that is a permissible final verdict resulting in a sentence for murder of at least 30 years in prison  without parole, provided that all jurors agree that defendant at least purposely or knowingly caused serious bodily injury resulting in death.

Docket Entry No. 19-3, at 14-22.

As already noted <u>supra</u>, a jury instruction that is inconsistent with state law does not merit federal habeas relief; such relief is warranted only if "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  <u>Estelle</u>, 502 U.S. at 72-73 Moreover, the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.  <u>Id.</u>; <u>see</u> <u>also</u> <u>Middleton</u>, 541 U.S. at 437 ("a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution").

Here, Petitioner asserts, in his Ground Twelve, that his trial judge instructed the jurors that their finding as to Petitioner's guilt on the murder charge did not have to be unanimous. However, the above-quoted lengthy instructions unambiguously indicate that Petitioner's trial judge did *not* so direct the jurors.  Rather, the trial judge meticulously went through each element of the murder offense, aggravated manslaughter offense and reckless manslaughter offense and, with regard to each element of each crime, detailed the alternative findings satisfying each such

43

element.   For instance, for the purposes of the murder offense, the trial judge detailed the

purposeful and knowing alternatives of the same element, explained how and whether the jurors

might factor the motif consideration, highlighted the causing-death and causing-serious-bodily-

injury-resulting-in-death alternatives of another element, etc.; the trial judge also provided an

analogous range of alternatives (allowed within each element) with regard to both forms of

manslaughter.   While factoring all these alternatives in, the trial judge – in no ambiguous terms –

instructed the jurors to reach a unanimous verdict as to each element of each offense underlying

the guilty verdict.[17]

Thus, read in toto, the jury instructions unambiguously establish that the violation of

rights asserted by Petitioner in his Ground Twelve simply did not take place; rather, Petitioner

self-servingly took one sentence out of the totality of his jury instructions, seemingly trying to

capitalize on the undue inferences that such out-of-the-context selection might offer.   The

constitutional due process guarantees, however, were neither meant nor do they support such

selective reading.   See Middleton, 541 U.S. at 437; Estelle, 502 U.S. at 72-73.   Therefore,

Petitioner's Ground Twelve challenges will be dismissed as not meriting habeas relief.

### K.       The Chain of Grounds Asserting Ineffective Assistance of Counsel

In addition to the above-discussed twelve grounds, Petitioner also asserted other grounds

(Grounds Thirteen to Seventeen, with his Ground Seventeen consisting of three "sub-grounds");

---

[17]   In other words, the instructions merely allowed for the scenario where the guilty verdict would be reached by e.g., with some jurors concluding that Petitioner murdered Connors by purposely inflicting serious bodily injuries that resulted death while other jurors concluding that Petitioner knowingly caused Connors' death.   In such scenario, each juror would arrive to his/her independent conclusion that Petitioner was guilty of murder, hence yielding a unanimous jury verdict that the State duly met its burden of establishing the murder charge beyond a reasonable doubt.

all these allegations are stating challenges to the assistance provided by Petitioner's trial and appellate counsel.  For the reasons detailed below, Petitioner's claims to that effect will be dismissed.

### 1.    *Assistance of Counsel*

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  See Strickland v. Washington, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  See Strickland, 466 U.S. at 687.  First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-88.[18]  The court must then determine whether, in light of all the circumstances at the time, the identified errors were so egregious that they were outside the wide range of professionally competent assistance.  See id.

---

[18]   See also, Strickland, 466 U.S. at 689 ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy"); Thomas v. Varner, 428 F. 3d 491, 499 (3d Cir. 2005) ("To overcome the Strickland presumption that, under the circumstances, a challenged action might be considered sound trial strategy, a habeas petitioner must show either that: (1) the suggested strategy (even if sound) was not in fact motivating counsel or, (2) that the actions could never be considered part of a sound strategy").

To satisfy the prejudice prong, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.   As the Supreme Court explained,

> [i]n making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

Strickland, 466 U.S. at 695-96.[19]

The Strickland test applies to the performances of both trial and appellate counsel.  See Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004).  When the issue is appellate counsel's failure to raise specific issues, a petitioner satisfies the first Strickland prong by showing that appellate counsel was "objectively unreasonable [i.e.,] that counsel failed to find [arguably] nonfrivolous issues and to file a merits brief about them."  Smith v. Robbins, 528 U.S. 259, 285 (2000).  An arguably nonfrivolous issue is "one that counsel can argue in good faith with some potential for prevailing." Id.

Consequently, the general principle established by Smith is that appellate counsel need not raise every non-frivolous issue on appeal; he "may select from among them in order to

---

[19]  The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one."  Strickland, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  Id.

maximize the likelihood of success on appeal." Id. at 288; see also Jones v. Barnes, 463 U.S. 745, 750 (1983) (rejecting "per se rule that appellate counsel must raise every nonfrivolous issue").

### 2.    *Challenges Based on Appellate Counsel's Performance*

Petitioner's Ground Thirteen, Ground Fifteen, second half of his Ground Sixteen and second half of his "sub-ground B" of Ground Seventeen challenge the performance rendered by Petitioner's appellate counsel.  Specifically, his Ground Thirteen asserts that the appellate counsel's performance failed to meet constitutional guarantees because the counsel did not challenge the circumstances of Petitioner's arrest or the form of Petitioner's indictment, or the trial's court decision not to grant Petitioner new trial.  Petitioner's Ground Fifteen simply restates Petitioner's self-serving conclusion that his appellate counsel's performance failed to meet constitutional guarantees.  The relevant part of Petitioner's Ground Sixteen asserts that the appellate counsel's performance failed to meet constitutional guarantees because the counsel elected not to challenge the trial court's jury instruction, while the relevant part of his "sub-ground B" of Ground Seventeen assets that the appellate counsel violated Petitioner's constitutional rights by not raising a state-law-based challenge legally irrelevant to Petitioner's circumstances.[20]

---

[20]  Petitioner referred to State v. Cooper, 151 N.J. 326 (1996).  In Cooper, the Supreme Court of New Jersey addressed the scenario where the defendant lured a six-year-old girl playing in her backyard away from the other children, picked her up, and walked away with her.  After the child was reported missing, the police found her body under the porch of an abandoned house where defendant lived; she was strangled to death and sexually assaulted.   The defendant was arrested, tried and convicted of kidnapping, aggravated sexual assault, felony murder, and purposeful-or-knowing murder; he was sentenced to death.  The defendant appealed both his

(continued...)

During Petitioner's direct appeal, his appellate counsel raised the following eight issues:

Point I
> The trial court erred in ruling that Defendant voluntarily waived his Miranda rights.

Point II
> The trial court erred by admitting into evidence the tape recorded confession of Defendant as that recording failed to meet the standards for its admission under State v. Driver.

Point III
> The trial court erred by denying the motion for a judgment of acquittal.

Point IV
> The trial court erred by admitting the autopsy photos as they were unduly prejudicial and not probative.

Point V
> The charge to the jury in its entirety, including the manner in which the court responded to jury requests for clarification, was confusing, misleading and prejudiced Defendant.

Point VI
> The verdict is against the weight of the evidence, and Defendant is entitled to a new trials.

Point VII
> The errors committed, in their entirety, denied Defendant a fair trial.

---

[20](...continued)
capital murder conviction and his death sentence. The court affirmed the murder and conviction, as well as his death sentence, while granting the defendant's request for a proportionality review of his death sentence. The court held that the defendant had not been denied a fair trial, and that the jury venire had been properly conducted. Moreover, the court also held that the jury was properly instructed and that, in that case, felony murder was a lesser included charge to be considered by the jury if they acquitted defendant of the capital murder charges. The court noted that, although the elements of felony murder may differ from those of a capital murder and, therefore, it may not be a traditional lesser included offense, it nonetheless should be treated as a lesser included offense when deciding what offenses must be submitted to the jury. Here, the lengthy excerpt of Petitioner's jury charge replicated by this Court supra indicates that Petitioner's trial Court included two lesser-included offenses in the jury instructions, and the sequential ordering of greater and lesser included offenses highlighted in Cooper was expressly incorporated in the jury charge given by Petitioner's trial judge.

Point VIII
    The sentence imposed was unjust, inappropriate and manifestly excessive.

Docket Entry No. 11-8, at 2-3 (corresponding to a sixty-three-page detailed argument).

    Notably, Petitioner has raised all (save one) of these points in his instant Petition.  The

fact that Petitioner reiterated the challenges raised by his appellate counsel in the instant Petition

operates  – in and by itself – as Petitioner's admission that he does not consider the points raised

by his appellate counsel frivolous.  Therefore, all Petitioner's challenges to his appellate

counsel's performance could be reduced to a mere expression of Petitioner's displeasure with the

fact that the appellate counsel did not raise the other challenges Petitioner thought of later on.

However, Plaintiff's appellate counsel had no obligation to raise facially meritless or legally

inapposite claims.  See Smith v. Robbins, 528 U.S. at 285; Jones v. Barnes, 463 U.S. at 750.

Therefore, Petitioner's challenges to the performance rendered by his appellate counsel will be

dismissed as not warranting habeas relief.


### 3.    *Challenges Based on Trial Counsel's Performance*

    Petitioner's Ground Fourteen, the first half of his Ground Sixteen, "sub-ground A" of his

Ground Seventeen and the first half of "sub-ground B" of Petitioner's Ground Seventeen raise

challenges to the performance rendered by Petitioner's trial counsel.

#### a.    *Challenges Related to the Jury Instructions*

    Petitioner asserts that his trial counsel was ineffective for failing to object to the charge

actually given to the jurors (as to the flight from the crime scene and the crime of robbery) and

for not requesting the charge based on Cooper.  However, Petitioner's trial counsel did, in fact,

object to inclusion of the instructions referring to the flight, and inclusion of instructions related

49

to robbery facially fails to meet the second prong of <u>Strickland</u>, since the trial judge did, in fact, dismiss that robbery charge.  That leaves the Court merely with Petitioner's contention that his counsel violated his constitutional rights by not requesting instructions based on the holding of <u>Cooper</u>.  However, since – as detailed <u>supra</u>, <u>Cooper</u> presents a state law precedent legally inapposite to Petitioner's circumstances.  Therefore, the decision of Petitioner's trial counsel not to seek inclusion of <u>Cooper</u> instructions could not violate the second prong of the <u>Strickland</u> test.[21]  In light of the foregoing, Petitioner's Ground Sixteen and the first half of his "sub-ground B" of Ground Seventeen merit no habeas relief.

### b.    *Challenges Related to Dr. Weiss' Testimony*

In his Ground Fourteen, Petitioner maintains that his trial counsel rendered constitutionally deficient assistance by allowing testimony of Dr. Weiss; Petitioner's "sub-ground A" of Ground Seventeen reiterates the same challenge.   The gist of these challenges can be reduced to Petitioner's claim that – in light of Dr. Weiss' impressive credentials and his detailed and careful report finding that, regardless of Petitioner's statement as to his consumption

---

[21]  Dismissing Petitioner's <u>Cooper</u>-based charge, the Appellate Division reasoned as follows:

> [R]egarding the <u>Cooper</u> issue, the PCR judge correctly concluded that, "if there was error in light of the proofs presented by the State[,]" nonetheless defendant had once again to meet the "but for" test of the second prong.  Defendant's contention on appeal that the "inclusion of [his] exposure without the death penalty in play satisfied the second prong by inevitably and wrongfully abetting a compromise verdict," is sheer speculation.  Given the trial record, we find no basis on which to conclude that the jury's verdicts were based on anything other than their considered assessment of the evidence which, as noted, was "overwhelming[ly]" indicative of defendant's guilt of the offenses charged.  For this reason, we concur with the trial judge that defendant failed to make a <u>prima facie</u> case of ineffective assistance of trial and/or appellate counsel on this issue.

<u>State v. Simmons</u>, 2009 WL 1310923, at *6 (N.J. Super. Ct. App. Div. 2009)

of drugs, Petitioner's defense based on mental incapacity was not viable – the shortcomings of

Dr. Rosenberg's findings in support of Petitioner's mental incapacity defense were particularly

glaring, since Dr. Rosenberg's credential depicted a novice in the area of forensic psychology

and Dr. Rosenberg's unscrupulous wholesale reliance on Petitioner's statements (materially

amplifying, in comparison with the factual statements Petitioner made to Dr. Weiss, Petitioner's

position as to the amount of controlled substances Petitioner consumed) rendered Dr.

Rosenberg's findings even less believable.

Addressing this line of Petitioner's challenges during his PCR appellate proceedings, the

Appellate Division stated:

> The State concedes, and we concur, that defense counsel "should not have
> informed the State that he and [d]efendant spoke with [Dr.] Weiss, should not
> have provided [Dr.] Weiss' report to the State, and should not have called [Dr.]
> Weiss as a witness."  The State argues, however, that trial counsel's decision to
> present Dr. Weiss as a witness "did not materially contribute" to defendant's
> conviction, because defendant would not have prevailed on his voluntary
> intoxication defense on the basis of Dr. Rosenberg's testimony alone.  We concur
> with this . . . .  The record reflects that Dr. Rosenberg's opinion was almost
> entirely based upon information provided to him by defendant.  Review of Dr.
> Rosenberg's testimony and report reveals that he took his summary of the events
> on the night in question directly from defendant's version of those events.
> Moreover, as the PCR judge noted in denying relief, the State's case against
> defendant was "overwhelming," including not only his own confession, but "a
> host of other proofs including physical evidence."  It is worth noting that the PCR
> judge had presided over the defendant's trial ten years earlier and had a clear
> recollection of the evidence presented at that trial.  Under the circumstances, we
> concur with the PCR judge's conclusion that, while defendant may have
> established a deficiency in trial counsel's performance, he nonetheless failed to
> meet the second prong of the Strickland test, namely that this particular aspect of
> trial counsel's performance was "so deficient as to create a reasonable probability
> that the[ ] deficienc[y] materially contributed to defendant's conviction."

State v. Simmons, 2009 WL 1310923, at *5 (citation to state law adopting the Strickland test for

the purposes New Jersey state proceedings omitted).

This Court finds the state courts' conclusions not an unreasonable application of Strickland.  As noted supra, Petitioner's position is that the contrast between the findings of Dr. Weiss and Dr. Rosenberg's findings only highlighted/amplified the deficiencies of Dr. Rosenberg's testimony.  However, such amplification cannot serve as a fact indicating that Dr. Rosenberg's testimony – which suffered of a multitude of shortcomings easily detectable by the prosecution (including Dr. Rosenberg's novice status and his wholesale reliance on Petitioner's statements) –  could have yielded is a reasonable probability of the jury having a reasonable doubt with respect Petitioner's guilt.

Correspondingly, the Court will dismiss Petitioner's challenges based on his trial counsel's decision to introduce Dr. Weiss' findings, since this line of challenges merits no habeas relief.

### 4.    *Challenges "Moored" to the Ground Seventeen*

In his "sub-section C" of Ground Seventeen, Petitioner asserts that "[t]he cumulative errors mandate that [P]etitioner's convictions be reversed and that he be afforded an evidentiary hearing."  As many Petitioner's above-discussed grounds, this sub-ground: (a) conflates two separate arguments; and (b) recites one of the already-raised points.  Specifically, Petitioner's "cumulative error" argument replicates the "cumulative error" argument raised in Petitioner's Ground Eight.

As this Court already explained with regard to Petitioner's Ground Eight challenges, cumulative error warrants habeas relief only where the errors have "so infected the trial with unfairness as to make the resulting conviction a denial of due process," Donnelly, 416 U.S. at 643, and such "infection" occurs only where the combined effect of the errors had a "substantial

and injurious effect or influence on the jury's verdict," Brecht, 507 U.S. at 637, i.e., a habeas petitioner is not entitled to relief based on cumulative errors unless he establishes "actual prejudice."  See Murray, 477 U.S. at 494; Fahy, 516 F.3d at 205.

Here, evidence establishing Petitioner's guilt was so solid that the deficiencies of Petitioner's trial (be they assessed in toto, as Petitioner's Ground Eight requested, or be they assessed with the limited focus of the oversights of Petitioner's trial counsel, as the "sub-section C" of Petitioner's Ground Seventeen requested), even if these deficiencies could have been avoided during Petitioner's criminal proceedings, could not change the outcome of Petitioner's trial.  Therefore, Petitioner's "sub-section C" of his Ground Seventeen – presenting nothing but a narrower form of the argument already set forth in his Ground Eight – warrants no habeas relief.

The foregoing analysis leave the Court only with Petitioner's assertion that his PCR judge unduly denied him an evidentiary hearing.[22]  However, Petitioner has no federal right to an evidentiary hearing or other relief denied by a state PCR court: infirmities in a state PCR proceeding do not raise constitutional questions in a federal habeas action.  See Hassine v. Zimmerman, 160 F.3d 941, 954 (3d Cir. 1998) ("what occurred in the petitioner's collateral proceeding does not enter into the habeas calculation").  Thus, errors in state PCR proceedings

---

[22]  The Appellate Division reflected on this Petitioner's challenge by observing:

Defendant argues that the trial court erred by failing to conduct an evidentiary hearing on his petition; however, defendant had the burden to establish a prima facie claim in support of his PCR petition in order to be entitled to an evidentiary hearing.  State v. Preciose, 129 N.J. 451, 462 (1992).  "To establish a prima facie claim of ineffective assistance of counsel, a defendant must demonstrate the reasonable likelihood of succeeding under the . . . test set forth in Strickland v. Washington."  Id. at 463. Defendant has failed to meet that burden here.

State v. Simmons, 2009 WL 1310923, at *6.

are collateral to the conviction and sentence and do not give rise to a claim for federal habeas

relief.[23]  See Hassine, 160 F.3d at 954.

## V.    CERTIFICATE OF APPEALABILITY

The Court must now determine whether a certificate of appealability should issue.  See

Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only

if the petitioner "has made a substantial showing of the denial of a constitutional right."  28

U.S.C. § 2253(c)(2).  "[A] petitioner satisfies this standard by demonstrating that jurists of

reason could disagree with the district court's resolution of his constitutional claims."  Miller-El

v. Cockrell, 537 U.S. 322, 327 (2003).  Here, the Court is persuaded that jurists of reason would

not disagree with this conclusion.  Therefore, no certificate of appealability will issue.

## VI.   CONCLUSION

For the foregoing reasons, this Court dismisses the Petition and denies Petitioner a writ of

habeas corpus, pursuant to  28 U.S.C. § 2254.  No certificate of appealability will issue, pursuant

to 28 U.S.C. § 2253(C)(2).

An appropriate Order accompanies this Opinion.


s/Renée Marie Bumb
**Renée Marie Bumb,**
**United States District Judge**


Dated: September 13, 2011

---

[23]  In the event Petitioner wishes to assert, in the second half of his "sub-ground C" of his Ground Seventeen, that this Court should hold an evidentiary hearing (rather than that Petitioner's PCR court unduly denied him evidentiary hearing), Petitioner's application to that effect is construed as a motion, and that motion is denied as moot.